UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-11098-GAO

HULL PERMANENT SEWER COMMISSION and TOWN OF HULL,
Plaintiffs,

v.

HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY,
Defendant.

OPINION AND ORDER
March 31, 2017

O'TOOLE, D.J.

The plaintiffs, Hull Permanent Sewer Commission and Town of Hull (collectively "Hull" or "the plaintiffs"), assert a breach of contract claim against the defendant, Hartford Steam Boiler Inspection and Insurance Company. The dispute arises from the defendant's refusal to indemnify the plaintiffs for damage to the plaintiffs' wastewater treatment plant caused by an incident involving a breakdown of an influent water pump at the facility. The parties have filed cross-motions for summary judgment.

I.      **Factual Background**

The following facts are undisputed unless otherwise noted:

A.      The Facility

Hull owns a waste water treatment facility which provides wastewater treatment and control services to more than ten thousand people (the "facility"). (Stipulation of Undisputed Facts ("SUF") ¶ 1 (dkt. no. 33).) The facility accepts wastewater from the sewer system of the Town of Hull, as well as from customers in the neighboring Towns of Hingham and Cohasset, treats the

wastewater, and then discharges it.[1] (Id. ¶ 3.) The sewer system includes a network of manholes and underground sewer pipes throughout the service area, ultimately converging into a 36-inch diameter main trunk sewer (or "interceptor") that leads into the facility. (Id. ¶ 5.) The facility handles an average flow of approximately 1.4 to 1.7 million gallons per day. (Id. ¶ 6.)

The Hull sewer system is a "separate" sanitary sewer system, i.e., it is designed to collect wastewater from homes and buildings. (Id. ¶ 7.) In general, however, most separate sanitary sewer systems in the U.S. are still subject to considerable amounts of "infiltration and inflow" of rainwater, storm water, and groundwater that enter the sanitary sewer pipes, and which can be particularly severe during major wet weather events. (Id. ¶ 8.) In some systems, during severe wet weather, the amount of surface water infiltrating or leaking into the system can be significantly greater than the baseflow of the actual sanitary sewage coming from homes and buildings. (Id.) For some systems, therefore, the largest peak flows received at a wastewater plant are associated with severe wet weather events, rather than the daily variation of the wastewater baseflow. (Id.) Although the incoming raw wastewater is diluted with the larger volume of the infiltrating surface water, it is still considered raw wastewater because it still includes the raw sewage component discharged from homes and buildings in the system. (Id.)

B.    The Wastewater Treatment Process

The overall wastewater treatment process can be summarized as follows: raw wastewater is carried from homes and businesses into the interceptor and from there into the headworks of the treatment facility. (Id. ¶ 9.) In the headworks, the raw wastewater undergoes three stages of

---

[1] The parties use the terms "wastewater," "raw wastewater," "sewage," "sanitary sewage," and "raw sewage" interchangeably. (SUF ¶ 4.)

pretreatment, after which the water flows into a pipe that leads to a collection receptacle called the wetwell. (Pl.'s L.R. 56.1 Counterstatement of Facts ¶ 13 (dkt. no. 44.)

The wetwell consists of two chambers each of which is 16.8 feet wide, 13.4 feet long, and 18.08 feet deep. (SUF ¶ 12.) Under normal operating ranges, the volume of the wetwell is 18,000 to 20,000 gallons. (Id.) At a high level, the wetwell capacity is about 32,000 gallons. (Id.) The wetwell is separated from a pump room that houses the influent pumps. (Id.) Enclosed piping from the wetwell leads directly into the suction ports of the influent pumps, passing through a heavy, reinforced concrete dividing wall that separates the pump room from the wetwell. (Id.)

After the partially treated wastewaster exits the wetwell, it is pumped by the influent pumps into primary clarifier tanks, through aeration tanks, and into secondary clarifiers. (Id. ¶¶ 10-11.) The treated effluent is then pumped to the chlorine contact tank where it is treated with chlorine before it flows into the underwater outfall pipe and is dispersed into the waters of Massachusetts Bay. (Id. ¶ 11.)

The influent pumping station is located on the lower levels of the plant's main operations and maintenance building. (Id. ¶ 13.) Both the headworks and the influent pumping stations/electrical room are located on the lower levels of the plant's main operations and maintenance building. (Id.)

The electrical room is located directly above the pumping station, and includes the electrical control equipment, variable frequency drives, and the main electrical switchgear for the pumping station and for other portions of the overall treatment plant. (Id. ¶ 14.)

Directly below the electrical room is the pump room, which houses the five main influent wastewater pumps, as well as associated valves, piping, and other equipment. (Id. ¶ 15.) The smaller pumps (Pump Nos. 1 and 2) are 20-HP units. (Id.) The larger pumps (Pump Nos. 3, 4, and

5) are 50-HP units. (Id.) All five pumps are installed with a vertical shaft orientation, with the electric motors mounted directly above the pumps. (Id.) Each pump has a check valve, a discharge isolation gate valve, and a suction isolation gate valve, located within each pump's adjacent piping. (Id.) All five pumps are equipped with variable frequency drive controls. (Id.)

The effluent pumping station is part of the facility but is located in a separate structure from the main building that houses only the effluent pumping station. (Id. ¶ 16.) Its function is to pump the treated, effluent water (that has passed through the treatment plant) into the final disinfection chamber (where the effluent is treated with chlorine and then de-chlorinated before it is released out to the ocean). (Id.)

C.     The Insurance Policy

Hull purchased from the defendant an Equipment Breakdown insurance policy that was in effect at the relevant time (the "Policy"). (Id. ¶ 17.)

The coverage grant of the Policy states that the "Equipment Breakdown Coverage provides insurance for a Covered Cause of Loss as defined in A.1. . . . ." (Id. Ex. 1 ¶ A (dkt. no. 33-1).). Section A.1 states in relevant part:

1. Covered Cause of Loss – "Accident"

The Covered Cause of Loss for this Equipment Breakdown Coverage is an "accident." Without an "accident," there is no Equipment Breakdown Coverage.
    a. "Accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:
        (1)    Mechanical breakdown, including rupture or bursting caused by centrifugal force;
        (2)    Artificially generated electrical current, including electrical arcing, that damages electrical devices, appliances or wires;
        (3)    Explosion, other than combustion explosion, of steam boilers, steam piping, steam engines or steam turbines;
        (4)    An event inside steam boilers, steam pipes, steam engines or steam turbines that damages such equipment;
        (5)    An event inside hot water boilers or other water heating equipment that damages such equipment; or
        (6)    Bursting, cracking or splitting.

4

"Accident" does not include any condition or event listed in Definition G.1.b.

    b. "Covered Equipment" means the following:

        (1) Unless specified otherwise [elsewhere]:

            (a) Equipment that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

            (b) Equipment which, during normal usage, operates under vacuum or pressure, other than the weight of its contents."

(Id. Ex. 1 ¶ A.1.)

Definition G.1 provides:

    1. "Accident"

        a. "Accident" is defined in A.1.a.

        b. None of the following is an "accident," however caused and without regard to whether such condition or event is normal and expected or unusual and unexpected:

            (1) Depletion, deterioration, rust, corrosion, erosion, settling or wear and tear;

            (2) Any gradually developing condition;

            (3) Any defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind;

            (4) Contamination by a "hazardous substance"; or

            (5) Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, lightening, adjusting or cleaning, or by performance of maintenance.

(Id. Ex. 1 ¶ G.1.)

The Policy also contains various exclusions. The Policy provides that the defendant "will not pay for any excluded loss, damage or expense, even though any other cause or event contributes concurrently or in any sequence to the loss, damage or expense." (Id. Ex. 1 ¶ B.) Water is one such exclusion:

    1. We will not pay for loss, damage or expense caused directly or indirectly by any of the following, whether or not caused by or resulting from an "accident."

    . . .

        f. Water

            (1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

            (2) Mudslide or mudflow; or

> (3) Water that backs up or overflows from a sewer, drain or sump. However, if electrical "covered equipment" requires drying out because of the above, we will pay for the amount you actually expend to dry out such equipment, subject to the applicable Property Damage limit and Direct Coverage deductible. We will not pay more than the Actual Cash Value of the affected "covered equipment."
>
> We will not pay to replace such equipment or for any other loss, damage or expense.

(<u>Id.</u> Ex. 1 ¶ B.1.f.)

D.     The Incident

On the morning of Wednesday, February 27, 2013, raw sewage influent Pump No. 3 stopped working. (<u>Id.</u> ¶ 18.) Staff from United Water, the operations contractor who performed day-to-day operating and maintenance services, responded to investigate the pump. (<u>Id.</u> ¶¶ 2, 19.) United Water found that Pump No. 3 was spinning backward because the check valve had become stuck in the "open" position, and thus was allowing wastewater to flow backward through the pump. (<u>Id.</u> ¶ 19.) The check valve is located on the discharge side of the pump and normally closes to prevent backflow through the pump when the pump is not running. (<u>Id.</u>) The spinning of Pump No. 3 also caused some flow from Pump Nos. 4 and 5 to be recycled back into the wetwell, causing the wastewater level to spike. (<u>Id.</u>) To stop the backflow and isolate the pump, United Water then began to close the two isolation valves (gate valves), located respectively at the discharge side and the suction side of Pump No. 3. (<u>Id.</u>) While they were closing the suction side isolation valve, that valve cracked, and United Water then placed temporary restraints around the suction valve to prevent it from rupturing more severely. (<u>Id.</u>)

Early the next day, just after midnight, Pump No. 4 suffered a mechanical failure. (<u>Id.</u> ¶ 20.) When Pump No. 4 was later removed and inspected, United Water discovered that a piece of wood was lodged in the impeller of Pump No. 4, and that this was apparently what caused the mechanical failure. (<u>Id.</u> ¶ 21.)

The failure of Pump No. 4 meant that only three of the five regular influent pumps remained available for operation. (Id. ¶ 22.) The flow of wastewater coming into the facility on that night was unusually high because of infiltration of rainwater, snow melt, and tidal surges. (Id.) The three remaining influent pumps were not able to keep up with the flow coming into the facility. (Id.)

The raw wastewater filled the entire depth of the basement pump room level (estimated at about 18 feet), completely inundating all the pumps and associated equipment. (Id. ¶ 23.) The raw wastewater ultimately reached a depth of approximately four to five feet in the electrical room that housed the main electrical controls and switchgear for the facility. (Id.) This electrical equipment was therefore exposed to the raw wastewater. (Id.)

The power went out as a result of the exposure of the electrical equipment to the raw wastewater. (Id. ¶ 24.) Given safety and fire concerns, the emergency generators that could have provided power to the facility were turned to the "off" position so that they would not come on. (Id.)

Because the effluent pumping station receives its electrical power from the main building, the submersible pumps at the effluent pumping station were damaged when the raw wastewater leaked through the electrical conduits that brought power to the effluent pumps. (Id. ¶ 25.) As a result, the effluent pump motors shorted out causing damage. (Id.)

E.    Claimed Damages

Hull alleges that it has suffered damages in excess of $4.4 million in connection with the facility's repair and restoration as of the date of the filing of the summary judgment papers. (Id. ¶ 28.) In addition, Hull alleges that because the defendant failed to pay its claim, it was required to borrow $6.9 million to reconstruct the sewer treatment plant with scheduled interest payments exceeding $1.65 million. (Id. ¶ 29.) Hull therefore seeks, in addition to other forms of damages,

damages equal to those amounts related to the costs, fees, and interest associated with the financing of the reconstruction of the sewer treatment plant. (Id.)

## II.    Discussion

Summary judgment is appropriate where there is no genuine dispute of material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue is one which "may reasonably be resolved in favor of either party," and a material fact is one which could affect the outcome of the litigation. Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quotations omitted). In determining whether genuine disputes of material fact exist, all reasonable inferences must be drawn in the non-movant's favor. Id. "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Adria Int'l Grp. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted); accord Fid. Co-op. Bank v. Nova Cas. Co., 726 F.3d 31, 36 (1st Cir. 2013)(citation omitted). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).

Under Massachusetts law, when there is no genuine dispute as to any material fact, the interpretation of the language of an insurance policy is a question of law appropriate for resolution by summary judgment.[2] Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc., 820 F.3d 36, 41 (1st Cir. 2016) (citation omitted); see also VT Mut. Ins. Co. v. Zamsky, 732 F.3d 37, 42 (1st Cir. 2013) (noting that the proposition that the "interpretation of an insurance policy typically embodies a question of law for the court" is "time-honored in Massachusetts" (citation omitted)).

---

[2] The parties agree the Massachusetts law governs the dispute.

"Generally the insured bears the initial burden of establishing coverage, while the insurer bears the burden on exclusions from coverage." Utica Mut., 820 F.3d at 41 (citing Boazova v. Safety Ins. Co., 968 N.E.2d 385, 390 (Mass. 2012)); accord Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 247 (1st Cir. 2013) ("[T]he insureds . . . have the initial burden of showing that the case involves a generally covered risk under the policy. Should the insureds accomplish that task, the burden shifts to the insurer . . . to show an exclusion applies." (citation omitted)).

> Insurance contracts are construed the same way as ordinary contracts:
>
> [W]e must construe the words of the policy in their usual and ordinary sense. Every word must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable. If in doubt, we consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered. When confronting ambiguous language, we construe the policy in favor of the insured and against the drafter, who is invariably the insurer, unless specific policy language is controlled by statute or prescribed by another authority. This rule of construction applies with particular force to exclusionary provisions.

Utica Mut., 820 F.3d at 42 (citing Metro. Prop. & Cas. Co. v. Morrison, 951 N.E.2d 662, 671 (Mass. 2011)); accord Fid. Co-op. Bank, 726 F.3d at 36–37 (citation omitted).

The present cross-motions focus essentially on two main issues: 1) whether the incident was attributable to an "accident" as defined by the Policy; and 2) if the incident was attributable to an "accident," whether the water exclusion provision of the Policy applies to bar coverage. As noted, Hull bears the burden of establishing coverage, while defendant bears the burden of demonstrating the exclusion. See Utica Mut., 820 F.3d at 41.

    A.    Was the Incident Attributable to an "Accident"?

Massachusetts courts employ a "train of events" test for coverage disputes. The test seeks to determine the "efficient proximate cause" of the loss to resolve coverage controversies in cases involving possible chain causation. Fid. Co-op. Bank, 726 F.3d at 37 (quoting Jussim v. Mass. Bay Ins. Co., 610 N.E.2d 954, 955 (Mass. 1993)). "The test requires courts to determine the efficient

9

proximate cause of a given loss, and '[i]f that cause is an insured risk, there will be coverage even though the final form of the property damage, produced by a series of related events, appears to take the loss outside the terms of the policy.'" Id. (quoting Jussim, 610 N.E.2d at 955). The "'active efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started and working actively from a new and independent source is the direct and proximate cause.'" Id. (quoting Lynn Gas & Elec. Co. v. Meriden Fire Ins. Co., 33 N.E. 690, 691 (Mass. 1893)).

The plaintiffs—who bear the burden of showing coverage—argue that Pump No. 4 was the efficient proximate cause of the loss. According to Hull's theory, Pump No. 4's failure was a mechanical breakdown which reduced the influent pumping capacity of the facility and prevented the facility from being able to handle the flow of material at the time of the incident. It denies that the failure of Pump No. 3 caused the damage because the four remaining pumps, along with additional back up pumps put into place after its failure, were able to adequately handle the level of flow for over twelve hours until Pump No. 4 failed. Hull relies primarily on the timeline, but also points to the defendant's purported concession that the facility was designed to function properly even if one of the five pumps failed, (see, e.g., Aff. Ned Paschke ¶ 17 (dkt. no. 32)), and the defendant's reliance in its coverage determination on the water exclusion and not on whether the incident was an "accident" under the Policy, (see e.g., Decl. Peter A. Halprin Ex. C (Letter from David Campbell to James Lampke ("Coverage Determination")) (dkt. no. 38-3)).

The defendant argues that Hull has not satisfied its burden of showing that the loss is attributable to a covered "accident." In particular, it argues that there were multiple failures of different pieces of equipment—Pump No. 3, which it maintains "tripp[ed] off line" and therefore is not an "accident" under the Policy, and Pump No. 4, which it concedes suffered a mechanical

breakdown and therefore is potentially a covered cause of loss, i.e., an "accident." It also points to the weather, a severe storm that caused major infiltration into the system at the time of the failures. (See SUF ¶ 22; see also Halprin Decl. Ex. C, Cover Determination, at 1; Halprin Decl. Ex. A at 3 (dkt. no. 38-1).)

On the record developed thus far,[3] Hull has failed to prove that the incident was caused by an "accident" as that term is defined in the Policy because it has not demonstrated that the breakdown of Pump No. 4 was the efficient proximate cause that "set[] in motion a train of events" which brought about the damage "'without the intervention of any force started and working actively from a new and independent source.'" See Fid. Co-op. Bank, 726 F.3d at 37 (quoting Lynn Gas & Elec. Co., 33 N.E. at 691 (Mass. 1893)). Hull asks the Court to infer, essentially from the chronology, that Pump. No. 4 was the efficient proximate cause, but it has not adequately ruled out the influences of the "unusually high" flow of wastewater (i.e., the heavy rainfall or the melting snow or tidal surges or some combination of those) and the failure of Pump No. 3. Additional pumps were put into place, but Hull has not provided sufficient uncontested details as to their capacity to process the volume of water coming into the facility. Further, although the facility continued to treat water between the failure of Pump No. 3 and the breakdown of Pump No. 4, it is unclear from the record how capably it was able to do so during that time period.

On the other hand, the defendant, who also moves for summary judgment on coverage, has failed to demonstrate that Hull cannot establish that the loss resulted from an "accident" as defined in the Policy. The defendant concedes that the failure of Pump. No. 4 was an "accident" because that pump suffered a mechanical breakdown after a piece of wood lodged in the impeller. The

---

[3] Discovery is stayed pending the outcome of the summary judgment motions. (Am. Pretrial Scheduling Order (dkt. no. 20).)

overflow of wastewater in the facility occurred not after the failure of Pump. No. 3, but after the ensuing mechanical breakdown of Pump No. 4. Under these circumstances, the defendant has not shown that the plaintiffs cannot prove that Pump No. 4's failure was the efficient proximate cause of the loss.

At this stage, with discovery yet to be completed, it is an open question whether the mechanical breakdown of Pump No. 4 set in motion the train of events leading to the catastrophic damage to the facility, i.e., the wastewater not being pumped out fast enough from the wetwell, the wetwell filling to capacity, preventing the wastewater from flowing from the headworks through the pipe to the wetwell at a sufficient rate, causing the headworks to overflow and inundate the pump room and then the electrical room. Both motions for summary judgment are therefore denied at this time as to whether the loss was caused by an "accident" within the meaning of the Policy.

      <u>B.</u>     <u>Does the Water Exclusion Apply?</u>

As described above, the Policy contains various exclusions. In relevant part, an exclusion for water states that the defendant "will not pay for loss, damage or expense caused directly or indirectly by any of the following, whether or not caused by or resulting from an 'accident,'" including "[w]ater that backs up or overflows from a sewer, drain or sump." (SUF Ex. 1 ¶ B.1.) The exclusion section also states that the defendant "will not pay for any excluded loss, damage or expense, even though any other cause or event contributes concurrently or in any sequence to the loss, damage or expense." (<u>Id.</u> Ex. 1 ¶ B.). This latter provision is an anticoncurrent cause clause.

"When damage arises from multiple causes, an 'anticoncurrent cause' provision may operate to bar coverage. Anticoncurrent cause provisions, which disclaim coverage when damage

is caused concurrently by an excluded peril and a covered peril, are valid and enforceable under Massachusetts law." Surabian Realty Co. v. NGM Ins. Co., 971 N.E.2d 268, 272 (Mass. 2012) (citation omitted); accord Boazova, 968 N.E.2d at 393–94.

The First Circuit recently explained the interplay between anticoncurrent cause clauses and all-risk policies:

> Understanding how all-risk policies work is fairly easy, at least at a certain level. If a peril is excluded, there is no coverage. See 3 Stephen A. Cozen, Insuring Real Property § 48.03[1], at 48–19 (2009). If a peril is not excluded, there is coverage. See id. It gets a bit more complicated when excluded and covered perils combine to cause the loss—i.e., when there is concurrent causation. Courts have adopted a few different approaches for dealing with this very situation. See id. We need not delve into them any further than to say that Massachusetts courts follow the "efficient proximate cause" approach: Skipping over nuances not relevant here, coverage exists if "the predominant cause of the loss is a covered peril," Boazova, 968 N.E.2d at 394 n.4, or if a covered cause sets in motion a "train of events" leading to the loss, Jussim, 610 N.E.2d at 955–56. Looking to contract around the concurrent-cause doctrine, the insurance industry has come up with anticoncurrent-cause clauses, which . . . bar coverage for damage caused by an excluded cause, regardless of whether a covered act also contributed to the damage. See Boazova, 968 N.E.2d at 394–95; see also 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:57, at 101–78 (2005).

Stor/Gard, Inc., 717 F.3d at 244–45 (footnote omitted).

The defendant argues that it is entitled to summary judgment because the water exclusion, together with the anticoncurrent cause provision, preclude coverage for the plaintiffs' insurance claim. It relies on two theories: 1) the loss was caused directly or indirectly by water that overflowed from a "sewer;" and/or 2) the loss was caused directly or indirectly by water that overflowed from a "sump." It contends that even if an excluded cause such as an overflow from a sewer or sump combined with a covered cause (e.g., mechanical breakdown of Pump No. 4) to bring about the  loss, the loss is not covered by the Policy by virtue of its anticoncurrent cause provision.

> i.   *Was the loss caused by water that overflowed from a sewer?*

The defendant argues that the loss was caused, either directly or indirectly, by water that "overflowed" from a "sewer" because either the interceptor pipe bringing wastewater into the facility overflowed or the facility itself is part of a sewer system and, therefore, part of a "sewer." The plaintiffs disagree, contending that the overflow occurred inside the facility, which is itself not a "sewer," even though it treats wastewater from a sewer system, and that there was no "overflow" of material into the facility because the sewer pipes functioned as they were intended to by delivering wastewater to the facility.

The defendant's argument regarding the interceptor pipe is unconvincing. The undisputed facts show that at some point after Pump No. 4 failed, water inundated the headworks of the plant and spread to other areas where it was not supposed to go. The interceptor pipe leading into the facility did not "overflow;" it simply brought wastewater into the facility, exactly as it was intended to do.

As to whether the water treatment facility itself is part of a sewer, the term "sewer" is not defined in the Policy. Therefore, reference to dictionaries for assistance in determining the plain and ordinary meaning is appropriate. See Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491, 498–99 (1st Cir. 2005). Dictionary definitions for the term include "an artificial usually subterranean conduit to carry off sewage and sometimes surface water (as from rainfall)," Merriam Webster Online Dictionary (Mar. 31, 2017, 2:07 PM), http://www.merriam-webster.com/dictionary/sewer, and "[a]n artificial, usually underground conduit for carrying off sewage or rainwater," American Heritage Dictionary of the English Language (Mar. 31, 2017, 2:09 PM), http://ahdictionary.com/word/search.html?q=sewer. Both of these definitions incorporate the idea of "carrying off" the wastewater from the point of collection somewhere else, presumably *to* a

14

wastewater treatment plant like the facility at issue.[4] Construing the term "sewer" in its "usual and ordinary sense," see Utica Mut., 820 F.3d at 42 (quoting Metro. Prop., 951 N.E.2d at 671), the term does not apply to mean an entire facility that treats wastewater.

Further, to the extent there are any ambiguities, Massachusetts contract interpretation principles support construing the policy in favor of the insured against the insurer, particularly with respect to exclusions. See id. (quoting Metro. Prop., 951 N.E.2d at 671); Vappi & Co. v. Aetna Cas. & Sur. Co., 204 N.E.2d 273, 275–76 (Mass. 1965) (citations omitted). A policy that would essentially exclude any coverage for loss resulting from an incident involving seepage of wastewater within the facility treating that wastewater, regardless of the efficient proximate cause, would not represent a reasonable expectation by the insured. See Nashua Corp. v. First State Ins. Co., 648 N.E.2d 1272, 1274 (Mass. 1995) ("We have stated that, when construing the language of an insurance policy, it is appropriate 'to consider [whether] an objectively reasonable insured, reading the relevant policy language, would expect to be covered.'" (quoting Hazen Paper Co. v. U.S. Fid. & Guar. Co., 555 N.E.2d 576, 583 (1990))).

Consequently, I conclude that the defendant has not shown that the water exclusion bars coverage based on water overflowing from a sewer, and is not entitled to summary judgment on that basis.

### ii.   Was the loss caused by water that overflowed from a sump?

As both parties agree, after the working influent pumps could no longer keep up with the flow of wastewater through the system, wastewater ultimately inundated the headworks of the plant. The defendant characterizes the incident as water "overflowing" from the wetwell, which it

---

[4] The two Massachusetts cases cited by the defendant, Denver St. LL v. Town of Saugus, 970 N.E.2d 273, 275 (Mass. 2012), and Town of Essex v. City of Gloucester, 967 N.E.2d 651, at *1 (Mass. App. Ct. 2012), do not require a different holding.

describes as a "sump," and therefore explicitly excluded from coverage. Hull contends that the wetwell is not a "sump," and that in any event, the damage occurred from an "overflow" of the headworks, not the wetwell. In its opposition to Hull's motion, the defendant further argues that the headworks is also a "sump" under the water exclusion, therefore triggering the applicability of the water exclusion, a contention with which Hull disagrees.

The term "sump" is not defined in the Policy. Dictionary definitions for "sump" include "a pit or reservoir serving as a drain or receptacle for liquids" such as a "cesspool" or "a pit that at its lowest point in a circulating or drainage system (as the oil-circulating system of an internal combustion engine)," see Merriam-Webster Online Dictionary (Mar. 31, 2017, 2:15 PM), http://www.merriam-webster.com/dictionary/sump), and "a low-lying place, such as a pit, that receives drainage" or a "cesspool," see American Heritage Dictionary of the English Language(Mar. 31, 2017, 2:20 PM), http://ahdictionary.com/word/search.html?q=sump.  These definitions are consistent with what the defendant acknowledges a layperson may consider a "sump." (Def.'s Mem. Law in Supp. of [Def.'s] Mot. for Summ. J. 13 (dkt. no. 31) ("To most laypersons, a 'sump' calls to mind the small basin at the low point of a residential basement."); accord id. at 14 ("[T]he point is simply that a 'sump' is simply a generic term for any pit or well where water or other fluids collect.").)

Although the defendant recognizes this lay understanding of the term, the defendant also argues that the terms "wetwell" and "sump," as used in the relevant industry, are synonymous. (Aff. Ned Paschke ¶¶ 10-11, Ex. B.) Because Hull acknowledges the facility has a wetwell, the defendant argues, it must also acknowledge that the wetwell is a "sump." Similarly, the defendant contends that the grit chamber, part of the headworks, is a pit in which water collects, which is

16

consistent with the usual and ordinary meaning of the term "sump" even though it has a particularized label within the sewer.

Whether the wetwell and headworks are properly characterized as "sumps" within the meaning of the Policy presents a mixed question of fact and law. The legal conclusion to be drawn will likely depend on what definition best fits the proper factual characterization, and that is a matter to be left to a factfinder considering disputed arguments. It is not a matter for summary judgment.

Furthermore, regardless of whether the wetwell and/or headworks are "sumps" under the Policy, there is a factual issue as to whether the water "overflowed" or "backed up" so as to fit within the exclusion in the Policy. In Surabian Realty Co. v. NGM Ins. Co., 971 N.E.2d 268, the Supreme Judicial Court interpreted a similar term in an insurance policy. In that case, a building suffered damage when a parking lot drain became clogged with debris during a rainstorm, causing heavy rains to collect in the parking lot and seep under the door of the building. Id. at 270. The main policy excluded damage caused directly or indirectly from "surface water" and, among other things, "[w]ater that backs up or overflows from a sewer, drain or sump," but the insured had purchased a supplement that amended the water exclusion to provide for some water-related coverage: "The most we will pay for loss or damage caused by water that backs up or overflows from a sewer, drain or sump is $25,000 for any one occurrence." Id. at 270–71. In construing the phrase "[w]ater that backs up or overflows from a sewer, drain or sump," the court stated that no Massachusetts case had previously defined the phrase. Id. at 272. The court noted that courts in other jurisdictions "have concluded that it refers to 'damage caused by water that has entered a drain and then is subsequently forced out from or through that drain.'" Id. It explained that courts differed as to whether "back[s] up" requires a "reversal of water flow or merely a diversion through

a blocked system," e.g., a different exit, but were consistent that "'the water [must have] occupied the pipe or drain before it caused the damage.'" Id. (citations omitted) (alteration in original). It went on to interpret the contract (as amended by the supplement) to "exclude damage caused by flood waters that spread over the surface of the ground without having entered the drain" because of the surface water exclusion in the contract, but "to cover damage caused by water that backed up after entering the drain" because of the supplement. Id. Because the damage resulted from a combination of a covered peril (water that backed up after entering the parking lot drain) and an excluded peril (water that never entered the drain and remained surface water), the court ultimately found that the Policy's anticoncurrent cause provision foreclosed the insured's claim. Id.

Whether what occurred at the facility was an overflow or backup is a disputed question of fact, to be resolved with guidance by Massachusetts case law, including Surabian Realty.

Consequently, the defendant has not shown at this stage that the water exclusion operates to bar coverage based on any purported overflow from the wetwell or headworks.

## III.   Conclusion

For the foregoing reasons, I conclude that Hull has failed to demonstrate the absence of a genuine issue of fact concerning whether the loss was the result of a covered "accident." I further conclude that the defendant has failed to show that Hull cannot successfully prove coverage or that the water exclusion of the Policy indisputably applies to bar coverage.

The cross-motions for summary judgment (dkt. nos. 30 and 34) are DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge